U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

JAN 25 2012

TONY R. MOORE, CLERK
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

---

SEARS, ROEBUCK & CO.

versus

CITY OF SHREVEPORT

CIVIL ACTION NO.  10-782

JUDGE TOM STAGG

---

## MEMORANDUM RULING

Before the court is a motion for summary judgment filed by the City of Shreveport ("the City") against the claims of Sears, Roebuck & Co. ("Sears") for flood damages. See Record Document 26. For the reasons set forth below, the City's motion for summary judgment is **GRANTED**.

## I. BACKGROUND

Sears brought this action seeking relief from the City for the damages it sustained during the storms of May 13, 2008, and October 29, 2009. Sears claims that the City's failure to complete construction of certain phases of the Ockley Ditch Flood Control Project caused flood damages to its store on the dates in question.

In November of 1992, the City applied to the Statewide Flood Control Program to obtain funds for the construction of a flood control project in the Ockley Ditch drainage basin. The consulting engineering firm of Owen & White aided the City in

preparing its application. See Record Document 26, Ex. 1 at 2. The proposed project included: channel excavation and channel paving approximately 16,300 feet along Bayou Pierre and approximately 7,500 feet along Ockley Ditch; the construction of a detention basin upstream of Missouri Pacific Railroad and north of Kings Highway on Ockley Ditch; and a diversion channel located 2,500 feet downstream of the 70th Street bridge. The design storm was a twenty-five year, twenty-four hour Technical Paper Number 40 hypothetical storm, and the detention basin was designed for the 100 year flood.[1] The entire cost of the project was estimated to be $13,640,150. See Record Document 28, Ex. F at 2-3.

On November 22, 1993, the City entered into an agreement with the Louisiana Department of Transportation and Development ("DOTD") to receive funding for the Ockley Ditch Project. See Record Document 28, Ex. B. The agreement provided that the scope of the project was the same as found in the City's application; however, the

---

[1] "[The] [r]ecurrence interval, also referred to as return period, is the average time, usually expressed in years, between occurrences of hydrologic events of a specified type (such as exceedances of a specified high flow or nonexceedance of a specified low flow). The terms 'return period' and 'recurrence interval' do not imply regular cyclic occurrence. The actual times between occurrences vary randomly, with most of the times being less than the average and a few being substantially greater than the average. For example, the 100-year flood is the flow rate that is exceeded by the annual maximum peak flow at intervals whose average length is 100 years (that is, once in 100 years, on average)[.]" The U.S. Geological Survey, http://water.usgs.gov/ADR_Defs_2005.pdf (last visited January 17, 2012).

City reserved the right to incorporate other items of work into the construction contract that were not eligible for state-aid, if it so desired. Under the terms of the agreement, DOTD was obligated to pay the City monthly 70% of the construction costs, but could not exceed the amount made available by the state legislature. Costs in excess of that amount were to be borne by the City. The City was additionally responsible for any costs that were not in accordance with the approved plans and specifications of the project. See id.

The City also agreed, inter alia, to furnish the funds for necessary land acquisitions, easements, and rights of way; to assume all maintenance and operation costs for the project and make all future alterations as may be required without cost to the State; to submit preliminary plans to DOTD for review and commentary; to make sure that advertisements and receipt of bids were in accordance with the Statewide Flood Control Program Procedural Manual; and to make design standards comply with DOTD criteria. See id. If certain tasks were not completed within a specified time period[2], then the agreement would become null and void and funds would be reallocated. Additionally, if the City desired to cancel the project before the receipt of any bids, it would bear any costs that were incurred up to that point. The

---

[2] For example, there was a deadline to acquire rights of way within three and a half years of the date that the City was notified its project has been funded.

3

completion and final acceptance of the project required a copy of the acceptance to be furnished to DOTD. Thereafter, the City would then assume the operation and maintenance of the project in accordance with the "Operation and Maintenance Manual" prepared by the City and approved by DOTD. See id.

According to DOTD officials John Rasi and D.J. Webre, a project sponsor, such as the City, can make changes to the project; however, to continue to receive state funds, a sponsor is required to resubmit calculations demonstrating that the proposed changes would still result in the same benefits as prescribed in the application. See Record Document 28, Ex. A at 44, 53, 68, 88 and Ex. E at 27. State funds are prorated to phases of construction, and if a sponsor cancels or modifies a phase, but desires to continue to receive state funding, then calculations must be resubmitted showing the benefits of the project would not change. If approved, DOTD would continue to fund the remaining phases.[3] If the sponsor cancels or modifies a phase and does not resubmit calculations, then the sponsor would not receive state funds for that phase or for other phases impacted by the cancellation or

---

[3] The court understands this to mean that a sponsor such as the City cannot modify a project or cancel phases while continuing to receive state funds for the project unless it can demonstrate that the initial benefit of the project would not change. The court does not take this to mean that a sponsor is absolutely obligated to complete the project as delineated in the initial application. Economic conditions vary and a city may be limited by funding shortages just as the state may be limited.

modification. See id. According to DOTD official D.J. Webre, sponsors have the authority to cancel phases because it is "their project"; DOTD's main responsibility is to provide the funds made available by the state legislature. See id., Ex. E at 37.

All phases of the project were completed except for phases seven, eight, and nine. Phase seven is the Ockley Drive at Betty Virginia Park to St. Vincent Lateral. That phase was designed, but after a review of costs and logistical issues, the City determined that phase seven was not economically possible to construct. See Record Document 26, Ex. 1 at 1-3. Ali Mustapha ("Mustapha"), the Assistant City Engineer whose primary responsibility was drainage and flood management, states in his affidavit that the original estimation of phase seven was $1.2 million, and after a review of the projected cost in 2001, it was estimated to be $5.2 million.[4] See id. Phase eight is the Ockley Detention Basin. It consists of a small detention basin to be constructed at the upstream end of Ockley Ditch above Interstate 49 near Kings Highway. Mustapha alleges that the City chose not to pursue the construction of this phase because the land required to build the basin could not be acquired from the

---

[4] In its statement of disputed material facts, Sears denies this allegation but does not point to any evidence to dispute it. Sears only argues that the City could not unilaterally cancel the phase.

property owner, the United Parcel Service, who was unwilling to sell at any price.[5] See id., Ex. 1 at 3-4. Sears denies this. Phase nine is a proposed diversion channel from Bayou Pierre to Sand Beach Bayou. According to Mustapha, this phase was not built because Bayou Pierre and Sand Beach Bayou are both channels owned and controlled by public entities other than the City which Sears, again, flatly denies with little evidentiary support. See id., Ex. 1 at 3.

On May 13, 2008, the Shreveport area was hit by a major storm. According to an investigation and report by Mustapha, this rainstorm was the second greatest rainfall event in the city's history exceeded only by the 1933 storm of record. See id., Ex. 1 at 5-8. Mustapha reported that the city received 10.14 inches of rain in less than sixteen hours. This was more than 23% of the normal total yearly rainfall for the Shreveport area. Between the hours of 8:00 p.m. and 10:00 p.m., the City received 6.79 inches of rain. Approximately 420 to 450 residential and commercial structures were flooded, including areas around the Ockley Ditch Basin which recorded the most rainfall. In his affidavit, Mustapha states that this storm exceeded a 200 year storm and the improvements to the Ockley Ditch were designed to handle a twenty-five year storm. See id. One of the City's expert witnesses, Ed Duranzyck, also

---

[5] According to Mustapha, the United Parcel Service was planning a major expansion of its facility and physical plant. See Record Document 26, Ex. 1 at 2-3.

6

attests that this was a 200 year storm.[6]  See id., Ex. 2 at 2.  Sears's own expert witness, John Krewson ("Krewson"), estimates in his deposition that the storm exceeded a 100 year event, although he did not perform any calculations to arrive at that assessment.[7]  See Record Document 28, Ex. L at 99-100.

The Shreveport area suffered another major storm on October 29, 2009. George Hudson ("Hudson"), an engineer with expertise in hydrologic and hydraulic analysis, testified on behalf of the City that this storm was a thirty-five year event; however, because the soil moisture was very high due to more than twenty inches of rainfall for the month of October, Hudson concluded that the 2009 storm had a frequency akin to a fifty year return interval.  See Record Document 26, Ex. 3 at 1,2, and 6.

Sears's store, located in Mall St. Vincent at 3601 Southern Avenue in Shreveport, suffered flood damage during both the 2008 and 2009 floods.  According to store manager, Deborah Blanc, the flooding of the store's bottom floor during the 2008 storm was approximately twelve inches deep and reached the third step of the

----

[6] Sears expresses in its statement of disputed material facts that it cannot deny or confirm the details of the 2008 storm alleged by the City's expert witnesses.  Sears does not present any of its own evidence detailing the May 13, 2008, or October 29, 2009, storms.

[7] See infra p. 18.

7

escalator. Sears had to close the store for three days while the lower floor of the store remained closed for several weeks. The bottom floor was also temporarily closed after the 2009 storm. See Record Document 28, Ex. K at 7, 19, 37 and 38. On May 13, 2010, Sears filed a complaint in federal court claiming that the flood damages it sustained on May 13, 2008, and October 29, 2009, were the direct result of the City's failure to complete construction of the Ockley Ditch Project.

## II. ANALYSIS

The legal theory upon which Sears's claims are based is unclear. In its complaint, Sears claims that the Ockley Ditch Channel Improvements included many deficiencies including: "the failure to develop a model of the basin and to use the model to devise an effective drainage plan"; "the lack of necessary channel improvements"; "the lack of adequate regional detention facilities for storm water"; and "the lack of a comprehensive written storm water management plan." Record Document 1. Sears's self-proclaimed "crux" of its claims is that the failure of the City to construct and complete certain phases (phases seven and eight) of the project caused the flood damages on May 13, 2008, and October 29, 2009. See Record Document 28 at 13. In its answer, the City claims that, inter alia, Sears failed to state a claim upon which relief could be granted, that the flood damages were caused by an act of God, that any duty the City owed to Sears did not encompass rains of this

8

historical magnitude, that the City has discretionary immunity, and that Sears suffered damages due to its own fault. See Record Document 9. Sears does not specify its theory of relief in its complaint, but the City's answer treats it as a negligence claim.

In its motion for summary judgment, the City argues that: (1) the 2008 and 2009 storms are acts of God thereby precluding Sears's claims for relief; (2) the claims are prescribed by Louisiana Revised Statute 9:5624; (3) the claim for damages arising out of the 2008 storm is prescribed by Louisiana Civil Code articles 3492 and 3493; and (4) the City has discretionary immunity with respect to its decisions to cancel phases of the Ockley Ditch Project.[8] Sears addresses these arguments in its opposition, but the force of its argument is that the flood damages sustained in 2008 and 2009 would not have occurred but for the City's failure to construct phases seven and eight of the Ockley Ditch Project.[9] Regarding the issues of prescription raised by the City, Sears only argues against the two-year prescriptive period under section 9:5624. Sears takes note of the City's argument that the 2008 claim has prescribed

---

[8] The City also argues that if the damages arising from the 2008 storm have prescribed leaving only the damages arising from the 2009 storm, then the remaining claims should be remanded to state court since the remaining claims are below the amount in controversy requirement for subject matter jurisdiction. See infra note 17.

[9] Sears does not assert that phase nine was necessary to prevent the flood damages sustained during the two storm events.

under the one-year prescriptive periods but does not make an effort to argue against it. In its reply, the City rebuts the points made by Sears but additionally argues that Sears failed to raise a genuine issue of fact with respect to whether the construction of phases seven and eight would have prevented the store's flooding.

As mentioned, not once does Sears state the theory on which its claims are based; however, the City treats Sears's claims as those of negligence. It appears that Sears never asserts that its claims are not based on a theory of negligence nor does Sears hint at any other theories of relief. For these reasons, the court will also treat Sears's claims as those of negligence in its analysis.

## A.    Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10]    Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

---

[10] The court notes that the newly amended Rule 56 requires that there be "no genuine **dispute** as to any material fact," but this change does not alter the court's analysis. Fed. R. Civ. P. 56(a) and advisory committee's note (emphasis added).

10

proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment. Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

**B.    Act Of God Defense.**

An act of God has been defined as a "providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care or by the use of those means which the situation renders reasonable to employ." S. Air Transp. v. Gulf Airways, 40 So.2d 787, 791 (La. 1949). An act of God is sufficient to discharge a duty and relieve a defendant from liability. See id. "It is not every 'act of God' however, that will relieve a defendant of liability." Gabler v. Regent Dev.

11

Corp., 470 So.2d 149, 152 (La. App. 5th Cir. 1985). "When an injury is due directly and exclusively to natural causes, without human intervention, an 'act of God' will provide insulation from liability for a defendant. When an 'act of God' combines or concurs with the negligence of a defendant to produce an injury, the defendant is liable if the injury would not have resulted <u>but for</u> his own negligent conduct or omission." <u>Id.</u> "If the injury was caused by some extraordinary or unusual natural force or condition that could not have been foreseen, or that would have caused the injury if there had been no negligence, the negligence is not the proximate cause of the injury." <u>Id.</u> at 153 (quoting <u>Rector v. Hartford Acc. & Indem. Co. of Hartford, Conn.</u>, 120 So.2d 511, 516 (La. App.1st Cir. 1960)). Heavy floods and rains have long been considered acts of God under Louisiana jurisprudence. <u>See</u> <u>Gabler</u>, 470 So.2d at 151. To adequately address the City's act of God defense, the court finds it proper to first determine whether the City was negligent in failing to construct phases seven and eight of the Ockley Ditch Project. <u>See</u> <u>Gabler</u>, 470 So.2d at 153.

**1.    Act Of Negligence.**

In determining issues of negligence, Louisiana courts employ a duty-risk analysis. <u>See</u> <u>Long v. State ex rel Dep't of Transp. And Dev.</u>, 916 So.2d 87, 101 (La. 2005); <u>see also</u> <u>Perkins v. Entergy Corp.</u>, 782 So.2d 606 (La. 2001). A duty-risk analysis requires a plaintiff to prove five elements:

> (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).

Id. Under the duty-risk analysis, all elements must be affirmatively answered for the plaintiff to recover. See LeJeune v. Union Pac. R.R., 712 So.2d 491, 494 (La. 1998). "A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty." Posecai v. Wal-Mart Stores, Inc., 752 So.2d 762, 766 (La. 1999). "Whether a duty is owed is a question of law." Peterson v. Gibraltar Sav. & Loan, 733 So.2d 1198, 1204 (La. 1999).

Sears does not explain in detail how the City was negligent, nor does it ever use the term "duty." Its argument assumes that the City was negligent because of its lack of compliance with the agreement which it had with DOTD, and this alleged negligence concurring with the 2008 and 2009 storms caused the flooding in question. Basically, Sears argues that the only material issue before the court is whether completion of phases seven and eight would have prevented the flood damages it suffered.

13

The City counters by stating that "Sears has not cited any applicable law to suggest that the presence of a proposed, but never completed, design of a project gives rise to a negligent act by a city . . . " and that "the failure of the City to construct a proposed phase of the project does not give rise to a cause of action in tort in favor of Sears, or any other plaintiff." Record Document 29 at 7. The City further argues that "Sears attempts to fashion a tort obligation on the part of the City from a contractual agreement in which the City agrees to accept funds from the state, if the funds are available, and the City decides to match with its own funds and build a project." Id. The court agrees with the City.

The threshold question in this case is whether or not the City owed a duty to Sears, not to DOTD, to complete all phases of the Ockley Ditch Project. Sears attempts, more or less, to create this duty out of the City's contractual agreement with DOTD; however, the terms of the agreement by themselves do not automatically create a duty in tort, owed to Sears or any similarly situated plaintiff, to complete the project.[11] "Generally, contractual duties are owed strictly by and to the parties to the

---

[11] The nature of the duty breached is the chief distinguishing factor between actions in tort and those in contract. See Pickels v. Brown, 431 So.2d 880, 883 (La. App. 2d 1983). Actions ex delicto involve the breach of a duty arising from statute or common sense and are owed to all; actions ex contractu involve the breach of a special duty, conventionally created, and owed to specific persons. See id.

14

contract."[12] <u>Smith v. State Through Dep't. of Public Safety</u>, 620 So.2d 1172, 1185 (La. App. 1st Cir. 1992). However, in some cases, a party's assumption of a contractual duty may create a corollary tort duty in favor of a third party. <u>See</u> <u>id.</u> For instance, a person who builds something pursuant to a construction contract owes a duty to third persons "to perform in a workmanlike manner free from defects attributable to either faulty materials or poor workmanship and, if the construction contract is negligently performed, a third person has a cause of action under Article 2315 for any injuries caused thereby." <u>Id.</u>

Nowhere does Sears appear to allege any negligent conduct of this type, <u>i.e.</u>, negligent maintenance or operation of the project, the use of faulty materials, or poor workmanship in the project's construction. Sears merely asserts that a political entity can and should be held liable in tort for failure to complete a proposed public works project or certain phases of that project, regardless of that political entity's justifications or current financial resources. A contractual duty to complete a project, or phases thereof, is not a corollary duty arising from a contract; it is a duty within the contract itself and is not created incidentally to the contract in favor of some third party. Phrased another way, the duty to comply with the terms of a contract is owed

---

[12] The City's agreement with DOTD does not contain a stipulation <u>pour</u> <u>autrui</u> provision in favor of Sears or any other third party. <u>See</u> Civil Code article 1978.

15

Case 5:10-cv-00782-TS-MLH Document 31 Filed 01/25/12 Page 16 of 25 PageID #: 1311

exclusively to the parties of the contract and does not extend to third parties without other supporting facts. The duty to complete phases seven and eight is owed exclusively to DOTD and is not owed to Sears or any other third parties who were to receive benefits from the proposed project.[13] The agreement's terms, without more, do not create a duty in tort owed to Sears, and Sears does not produce any other supporting facts which would impose such a duty.

Furthermore, the City was never obligated to take on this project, nor was the City required to complete all phases of its own project. If anything, construction of phases one through six probably made the flooding situation better than it would have been without the project. Under the facts presented, the failure to complete phases seven and eight did not exacerbate the flood situation of the Ockley Ditch Basin as compared to before the adoption of the project; it was just not sufficient to prevent floods of the magnitude of the 2008 and 2009 floods. The City does not have a tort duty to prevent every type of flood, nor does it have the ability to forecast and defend against every force of nature, i.e., tornados, tsunamis, or 100 year rainfalls.

Based upon the facts presented by the parties, the court holds that the City did not owe a duty to Sears or any other similarly situated plaintiff to complete phases

---

[13] The court's reasoning should not be understood to mean that the City, in fact, breached any terms of its agreement with DOTD.

seven and eight of the Ockley Ditch Project.[14] The agreement between the City and DOTD does not confer this duty, nor does any statute or operation of law confer this duty. If any duty had been owed to Sears, the City's decision not to construct phases seven and eight did not create an unreasonable risk of harm and does not constitute a breach thereof.

### 2.    Proximate Cause.

Even if the City had breached a duty to Sears by not completing phases seven and eight of the Ockley Ditch Project, the City is still not liable because the City's actions or inactions were not the proximate cause of Sears's injuries. The 2008 and 2009 storms, which the court finds to be acts of God, are the proximate causes of those injuries.

As cited previously, if the injury in question was caused by some extraordinary natural force that could not have been foreseen or if the injury would have occurred had there been no negligence, then the negligence is not the proximate cause of the injury. See Gabler, 470 So.2d at 153. The parties do not agree on the exact return periods of the storms, and Sears refuses to confirm or deny any of the flood data gathered by the City's experts. Some of the City's experts conclude that the 2008

---

[14] The court's decision precludes relief based upon Louisiana Civil Code article 2315, article 2317, and other actions ex delicto.

storm exceeded a 200 year storm and the 2009 storm was akin to a fifty year event. As mentioned, while Sears states it cannot confirm or deny this, its own expert witness, Krewson, estimates that the 2008 storm exceeded a 100 year event. During Krewson's deposition, the following colloquy took place:

> Q:   Did you -- or do you have any opinion concerning the return frequency of the May 2008 rainfall event in the Ockley Ditch?
>
> A:   My sense was that it was at or -- my memory is I took it to be about a hundred-year plus, 110-year, 1 -- about 10 percent higher than the hundred-year storm. Based on the elevations on the GIS map and the limits on the floodplain -- on the flood map, and then the extent of the flooding that occurred at the time, that was my take on it.
>
> Q:   So is it your opinion that the return frequency of the flow in Ockley Ditch for the May 2008 storm is 100-year or 110-year return frequency?
>
> A:   Yes, in -- in the hundred-year or somewhat slightly -- or somewhat in -- at the hundred-year or 100-plus-year frequency, yeah.

Record Document 28, Ex. L at 99-100. Regardless of the exact classification of the storms, Sears can hardly contest that both of these events were major storms and rare occurrences, and therefore, could not have been reasonably foreseen. Because of the unforeseeable nature of the storms and because they were substantial factors in Sears's injuries, any negligence on the part of the City was not the proximate cause of Sears's injuries. Accordingly, the City is not liable for those injuries.

18

## C.    Discretionary Immunity.

The City also argues that even if it were negligent, its actions are immune

under Louisiana Revised Statute 9:2798.1.   Louisiana's discretionary immunity

statute provides that

> [l]iability shall not be imposed on public entities or their officers or
> employees based upon the exercise or performance or the failure to
> exercise or perform their policymaking or discretionary acts when such
> acts are within the course and scope of their lawful powers and duties.

La. R.S. 9:2798.1B.  The Louisiana Supreme Court has adopted the rule enunciated

in Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954 (1988) which governs the

application of discretionary immunity.  See Cormier v. T.H.E. Insurance Co., et al.,

745 So.2d 1, 6 (La. 1999).  In determining discretionary immunity under Berkovitz,

"the court must first consider whether the government employee had an element of

choice and his course of action was not specifically prescribed by the statute,

regulation, or policy."  Marino v. Parish of St. Charles, 27 So.3d 926, 931 (La. App.

5th Cir. 2009) (citing Fossier v. Jefferson Parish, 985 So.2d 255, 258 (La. App. 5th

Cir. 2008)).  "Thus, discretionary immunity will not apply when a specific course of

action is prescribed as the employee has no rightful option but to adhere to the

directive."  Id.  When discretion is involved, the second prong of Berkovitz directs

the court to determine whether that discretion is grounded in social, economic, or

19

political activity. See id. If it is, then the doctrine applies and the employee is shielded from liability; if not, the employee is liable for any negligence. See id.

The City argues that its fiscal decisions, which include the designed level of the City's storm drainage capacity and improvements to its drainage systems, are discretionary. In Mustapha's affidavit, the City has articulated financial limitations, right of way availability, and feasibility issues as reasons for not completing phases seven, eight, and nine of the Ockley Ditch Project, the most significant of which seems to be the availability of city funds. The City argues that its decisions are well grounded in social and economic policy.

Sears attacks the first prong of the Berkovitz test by asserting that the City did not have discretion to "unilaterally cancel" those phases of the project, regardless of the social, economic, and political considerations in its decision. See Record Document 28 at 20. Specifically, Sears argues that the policy of the Statewide Flood Control Program, via the agreement[15], bound the City to complete all stages of the project, and the City could only cancel or modify phases with DOTD's approval. Sears also asserts that Louisiana Revised Statute 38:90.11 takes away the City's

---

[15] Sears also argues that Louisiana Administrative Code § 325 expressly provides that DOTD and program sponsors are bound by the agreements they enter into. That provision states, in pertinent part, that "[the] agreement stipulates what must be followed during all construction phases of the project[.]"

discretion since it provides that "[DOTD] shall approve the engineering and construction plans for the proposed project . . . ."

The court finds that the City and DOTD are certainly bound by the agreement; however, the court does not find that the agreement, Louisiana Revised Statute 38:90.11, and Louisiana Administrative Code Title 56, Part III, § 325 obligate the City to complete all phases of the proposed project. Sears attempts to characterize the City's obligations under the agreement as those that absolutely bind the City to complete the project unless DOTD allows otherwise. This is not how the court understands the agreement or the State Flood Control Program in its entirety. The City is obligated, inter alia, to notify DOTD of cancellations and modifications and submit recalculations to obtain the department's approval for the purpose of continuing to obtain state funds for other project phases when the City cancels or modifies a phase. The purpose of the program is to fund flood control projects of a public entity's choosing and with the approval of DOTD; not to obligate a public entity to complete a project it initiates. As one of Sears's DOTD witnesses states, ultimately the City has authority to cancel a project phase because "[i]t's their project." See Record Document 28, Ex. E at 37. D. J. Webre stated the following in deposition:

Q:   So in the situation of the detention basin, who has the authority
     to just cancel that phase that's already been approved by the
     DOTD and by the legislature?

A:   The sponsor has the authority. It's their project. All we're doing
     is providing funds made available by the legislature. So the
     sponsor has that authority. It's their responsibility to their local
     people.

Id. The ramification of cancelling or modifying a phase without DOTD's approval

is simply the City's not being allowed to obtain funds for the modified phase or for

later phases of the project. The City did not contract away its discretion by entering

into the agreement with DOTD.

Under the second prong of Berkovitz, another two-step analysis is applied to

invoke immunity. See In re Katrina Canal Breaches Consol. Litig., 629 F.Supp.2d

601, 612 (E.D. La. 2009). First, it must be determined whether the governmental

action was taken as a matter of choice. See id. Second, the action must involve

discretionary policy-making to receive immunity; as opposed to an action that is

operational in nature. See id. Neither of the parties assert that the City's inaction in

completing phases seven, eight, and nine was not a matter of choice. Additionally,

neither party raises the issue of whether the City's decision was operational or

ministerial. Despite this, the court finds that the City's decision is one that involves

policy considerations as opposed to being operational. As mentioned previously,

22

according to Mustapha, phase seven was estimated to be $4 million more than originally planned, and phase eight was cancelled because the owner would not sell the land.[16] These reasons, especially the availability of City funds, demonstrate that this was a policy decision and not an operational one.

For the foregoing reasons, the court finds that the City is immune from suit pursuant to Louisiana Revised Statute 9:2798.1 with respect to Sears's claims.[17]

---

[16] Sears argues that the land could have been expropriated but the City chose not to do this. Sears fails to note, however, that the City must still pay the owner the fair market value of the expropriated property, and, as mentioned previously, the City claims to have limited funds. The decision whether or not to expend public funds to expropriate private property for public purposes is one grounded in policy. Surely, the City has the power to expropriate land for needed public improvement projects, but it is within its discretion to exercise that power. The court finds it difficult to believe that the agreement with DOTD takes away that discretion.

[17] Although not necessary, the court has also considered the City's other defenses in this matter. Regarding the assertion that Sears's claims have prescribed, the court finds that the two year prescriptive period for public works under Louisiana Revised Statute 9:5624 does not apply. This prescriptive period only applies to injuries incurred "for public purposes." See Avenal v. State of La. and the Dep't of Natural Res., 886 So.2d 1085, 1108 (La. 2004). Injuries incurred "for public purposes" are those that are an intentional or are a necessary consequence of a public undertaking. See id. at 1108-09. Since the Ockley Ditch Project was initiated for the purpose of mitigating floods, it can hardly be argued that flooding was an intentional or a necessary consequence of the project. Accordingly, the one year prescriptive periods under Louisiana Civil Code articles 3492 and 3493 for delictual actions and for damage to immovable property apply. See id. at 1108. Under Louisiana law "when conflicting statutes are applicable, the one more specifically directed to the matter applies." Avenal, 886 So.2d at 1108 (citing Estate of Patout v. City of New Iberia, 738 So.2d 544 (La. 1999)).

23

### III.  CONCLUSION

For the foregoing reasons, the City's motion for summary judgment is **GRANTED**. Sears's claims against the City with respect to the damages it sustained from the May 13, 2008 storm and October 29, 2009 storm are **DISMISSED WITH PREJUDICE**.

An order consistent with the terms of this Memorandum Ruling will issue herewith.

---

Louisiana Civil Code article 3492 provides a general one year prescriptive period while Louisiana Revised Statute 9:5624 provides a two year prescriptive period directly applicable to private property damage as a result of public undertakings. See Avenal, 886 So.2d at 1108. The instant suit was filed two years after the May 13, 2008 storm, the date on which Sears's damages were sustained. Since Sears instigated the suit more than a year after it had knowledge of its injuries on May 13, 2008, its claims arising out of the 2008 storm have prescribed which leaves only the damages from the 2009 storm. If the court had not decided the case on other grounds, only the claim arising out of the 2009 storm would have remained.

The City goes on to argue that if only the damages from the 2009 storm remain, which are below the jurisdictional requirement of $75,000.00, that claim should be remanded to state court for lack of subject matter jurisdiction under 28 U.S.C. § 1332. The City is incorrect, however, in requesting the court to remand that claim to state court. A federal court does not have authority to remand a case to state court that was not removed from state court in the first place. The court would, however, have authority under certain conditions pursuant to 28 U.S.C. § 1367 to dismiss any state law claims.

24

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this the 25th day of

January, 2012.

JUDGE TOM STAGG